**Opinion issued September 25, 2025**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-23-00683-CV**

————————————

**JOHN JAMAR, Appellant**

**V.**

**JIM NISE AND JULIE NISE, Appellees**

---

**On Appeal from County Civil Court at Law No. 1**
**Galveston County, Texas**
**Trial Court Case No. CV-0088865**

---

**MEMORANDUM OPINION**

In this landlord-tenant dispute, Jim Nise and Julie Nise sued John Jamar for breach of a residential lease. After a bench trial, the trial court found Jamar liable and awarded the Nises damages for unpaid rent, late fees, violations of certain lease terms, costs of repair, and attorney's fees.

On appeal, Jamar contends in seven issues that the trial court erred in continuing trial, admitting certain evidence, and calculating damages.

We affirm.

## Background

In their petition, the Nises alleged that they rented a home in Friendswood to Jamar under a residential lease[1] for a term that began on January 12, 2019, and ended on March 31, 2020. The parties later agreed to a one-year extension of the lease.

According to the Nises, Jamar breached the lease by failing to timely pay rent, writing insufficient checks, failing to pay late fees, damaging the premises, and refusing to vacate the premises after the lease terminated. The Nises also had to pursue a forcible entry and detainer suit to compel Jamar to leave the premises.

The Nises sought damages for unpaid rent, insufficient checks used for rent payments, and late fees; for cleaning of and repairs to the property; and for attorney's fees incurred in the forcible entry and detainer suit. They also requested their attorney's fees and costs incurred in this suit.

Jamar answered, generally denying the Nises' allegations and asserting various defenses.

---

[1] The parties based the lease on a form made available by the Texas Association of Realtors.

2

The case was set for trial to begin on April 21, 2023. On that date, the Nises attempted to call David Smith as their sole witness. Jamar objected, citing surprise and noting that the Nises had not identified Smith in their initial disclosures as a person with knowledge. The trial court granted a continuance to give the Nises time to amend their disclosures.

Trial resumed on May 5, 2025. After the trial court overruled Jamar's objection to Smith's appearance, Smith testified that he was a real estate broker with 40 years of experience helping people buy and sell property to lease. He also worked as a contractor and had experience valuing property in eminent domain proceedings.

Smith helped the Nises locate and acquire the house they leased to Jamar. The Nises bought the house with the intent to resell it at a profit. But soon after their purchase, Hurricane Harvey struck Houston. The property sustained extensive damage and had to be completely remodeled.

After completing the remodel, the Nises tried to sell the property but did not succeed. They decided to rent it. Jamar was their first tenant. Smith, with Jamar's real estate broker, drafted the lease.

Jamar agreed to pay a $3,500.00 monthly rent during the lease term of January 14, 2019 to March 31, 2020. When the initial lease term expired, the parties agreed to extend the lease to March 31, 2021 at a monthly rate of $3,800.00.

Rent was due on the first day of each month and if not paid by the sixth, an initial late charge of $50 would be assessed plus an additional $25 late charge "per day thereafter until the rent and late charges [we]re paid in full." Jamar also agreed to pay the Nises $100.00 for any rent payment returned by the bank, plus any late charges due before rent was paid in full. And if Jamar failed to vacate the property when the lease ended, he agreed to "pay [the Nises] rent for the holdover period and indemnify [the Nises] and prospective tenants for damages, including but not limited to lost rent, lodging expenses, costs of eviction, and attorneys' fees." The provision notified Jamar that "[r]ent for any holdover period will be three (3) times the monthly rent, calculated on a daily basis, and will be immediately due and payable without notice or demand."

Jamar also agreed to perform various property maintenance responsibilities under the lease. Pertinent here, he agreed to keep the property clean; supply and change heating and air conditioning filters at least once a month; and maintain, at his expense, all lawns, shrubbery, bushes, flowers, gardens, trees, or other landscaping, including mowing, fertilizing, and trimming, watering at reasonable and appropriate times using the sprinkler system, controlling pests and weeds, and removing debris.

The Nises agreed that Jamar could have three pets on the property. Otherwise, Jamar agreed that he would "not permit, even temporarily, any pet on the property."

If he did, he understood that he would be in default of the lease and be charged, as additional rent, "an initial amount of $100 and $15 per day thereafter" for each day he violated the pet restrictions.

Because the Nises had no experience as landlords, Smith encouraged them to document everything. Mrs. Nise kept spreadsheets to track rent payments, late fees, pet, violation fees, and bills related to the lease. She shared the spreadsheets with Smith. Over the course of the lease, Smith learned that several checks that Jamar used to pay the rent were returned for insufficient funds. Smith checked the spreadsheets against the copies of checks that he received from Mrs. Nise when they came in as insufficient, as well as the other checks in evidence. According to Smith, the spreadsheet correctly reflected his knowledge about when the Nises received Jamar's rent payments.

Also, because the Nises lived out of state, Smith helped them monitor the property. During the "couple of years" that Jamar was leasing the property, Smith visited it "numerous times." At least three times, he saw that Jamar had more than three pets on the property.

Toward the end of the lease term, Smith made a few trips on behalf of the Nises to speak with Jamar. The Nises wanted to put the house on the market in the spring. They had extended the lease to March 2021, but Jamar did not want to leave until the school semester was over so his daughter could finish the school year. Smith

was also copied on emails between the Nises and Jamar about his needing to move out. And ultimately, Smith helped the Nises with the eviction proceedings against Jamar.

Smith reviewed plaintiffs' exhibit 4, titled "John Jamar Payment History, Late Fees & Pet Violation Fees," and found that the certain charges had been miscalculated. He wrote his corrections on a copy of exhibit 4, which the trial court admitted as plaintiffs' exhibit 4A.

Smith testified that he inspected the property after Jamar moved out. The house was filthy. He saw many items that needed to be addressed. A lot of trash was left in the house, and the refrigerator was still full of food. Seven trailer loads of junk in and on the property had to be hauled to the dump.

Smith saw evidence of damage throughout the house caused by pets, particularly in a couple of rooms where it appeared that the dogs had spent a lot of time. Doors and baseboards had to be replaced because they had been chewed and scratched, and there was a lot of woodwork damage throughout the house.

Smith added that the air conditioning unit needed repair. He opined that the repair it needed was not a routine repair and was necessary because Jamar had not replaced the air conditioning filters in a timely manner.

And Smith recounted that Jamar's dogs had destroyed the lawn, so it had to be completely resodded. The flower beds and shrubs had not been maintained, so they also had to be replaced.

The Nises had Smith, through his contracting company, make the repairs required to restore the property to a salable condition. Smith charged the Nises for the repairs at cost, without any overhead. Plaintiffs' exhibit 5, titled "John Jamar Damage/Repair Costs" (the "damages summary") itemizes the amounts paid for materials and labor. Smith confirmed that the itemized billing shown on plaintiffs' exhibit 5 did not include any repairs made because of reasonable wear and tear on the property, such as nail holes in drywall, scuff marks, or traffic patterns in the carpeting. According to Smith, it cost just under $16,000 to restore the Nises' property to a salable condition.

John Jamar testified that he rented the property from the Nises. When he moved in, the home "was in new condition, good condition." In negotiating the lease, he spoke to Mrs. Nise about having three dogs. She told him not to worry about it and that they were "big dog people." Jamar acknowledged that sometimes there were four dogs on the property. His father would bring his dog when he came to stay with Jamar "a month here, a month there." Jamar didn't think his father stayed with him for more than four months total.

Jamar disagreed about whether he left the house in a filthy condition. He acknowledged that some debris was left in the house because he was not given more time to vacate it, but it was not the large amount of trash as described by Smith. Jamar also disagreed with Smith's testimony that Jamar did not regularly change the air conditioning filters.

In its judgment, the trial court awarded the Nises $22,800.00 in unpaid rent, $4,825.00 in late fees, $8,000.00 for pet fees, $10,232.19 for repairs and cleanup, and $12,533.00 in attorney's fees. At Jamar's request, the trial court also made findings of fact and conclusions of law supporting the judgment.

## Continuance of Trial

In his first issue, Jamar asserts that the trial court erred in continuing trial.

This issue challenges the trial court's ruling granting the Nises' oral motion for a continuance, made after the Nises attempted to call Smith, who had not been identified as a potential witness in their initial disclosures. *See* TEX. R. CIV. P. 194. Jamar did not object, and the trial court agreed to continue the case.[2]

Because Jamar did not timely object to the request for continuance in the trial court, he did not preserve this issue for appellate review. *See* TEX. R. APP. P. 33.1.

---

[2] Under Texas Rule of Civil Procedure 193.6(b), when a party wants to call a witness who was not timely disclosed in discovery, the trial court may "grant a continuance or temporarily postpone the trial to allow a response to be made, amended, or supplemented, and to allow opposing parties to conduct discovery regarding any new information presented by that response." TEX. R. CIV. P. 193.6(c).

## Admission of Evidence

In his second, third, and fourth issues, Jamar complains that the trial court erred in admitting Smith's testimony and exhibits 4 and 5—the Nises' damages summary and Jamar's payment history, late fees incurred, and pet violations.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011); *Arispe v. Velazquez*, No. 01-23-00188-CV, 2023 WL 8938410, at *4 (Tex. App.—Houston [1st Dist.] Dec. 28, 2023, no pet.) (mem. op.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless it probably caused the rendition of an improper judgment, which usually requires a showing that the judgment turns on the evidence admitted or excluded. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000); *see* TEX. R. APP. P. 44.1.

In asserting that the trial court should have excluded Smith from testifying, Jamar relies on the objection to Smith's appearance he made on the first day of trial. But the trial court continued the trial setting to give the Nises time to amend their initial disclosures and identify Smith as a witness, which they did. Jamar objected that he did not receive the amended disclosures, but the Nises showed proof of service, and the trial court overruled Jamar's objection.

The trial court explained the basis for its decision to admit Smith's testimony in its findings of fact and conclusions of law. The trial court found:

- The Nises filed initial disclosures on March 24, 2023, which was 18 days after Jamar's trial counsel made her appearance, and more than a month before the trial setting of May 9, 2023. Jamar was not prejudiced by that late filing.

- Jamar filed amended disclosures on April 27, 2023. The Nises were not prejudiced by that late filing.

- The Nises filed amended disclosures on May 1, 2023 under an agreement made in open court. The only significant amendment was the addition of Smith as a witness.

- The Nises requested the addition of Smith as a witness and argued it was necessary because the Nises were out of the country and unable to attend the amended trial date and the Court had denied their request to appear via Zoom.

- The addition of Smith as a witness should not have been a surprise to Jamar as Smith was heavily involved in the interactions between the parties from the beginning, had drafted the lease, and had been a primary contact for Jamar concerning the lease for over 4 years before the trial date due to the Nises being out of state during the term of the lease.

Jamar does not challenge any of these findings and thus waives his second issue. *See, e.g.*, *Stanley v. DFW Boats*, No. 01-23-00755-CV, 2025 WL 2471796, at *12 (Tex. App.—Houston [1st Dist.] Aug. 28, 2025, no pet. h.) (holding that appellant waived challenge to trial court's findings of fact where he failed to explain deficiency in each pertinent finding); *Lombardo v. Battacharyya*, 437 S.W.3d 658, 667 n.3 (Tex. App.–Dallas 2014, pet. denied) (holding that appellant waived

10

appellate issues challenging unspecified findings of fact); *see generally* TEX. R. APP. P. 38.1(i) (An appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to the authorities and to the record.").

Jamar next argues that the trial court erred in allowing Smith to testify about exhibit 4, the damages summary, and exhibit 5, a list of Jamar's rent payment history, late fees incurred, and pet violations, because Smith lacked the personal knowledge required to authenticate them.

Texas Rule of Evidence 901 explains that authenticating or identifying evidence requires "evidence sufficient to support a finding that the matter in question is what the proponent claims it is." TEX. R. EVID. 901(a). "The testimony of a witness with knowledge is one way to prove authenticity." *Constant v. Gillespie*, No. 05-20-00734-CV, 2022 WL 1564555, at \*6 (Tex. App.—Dallas May 18, 2022, no pet.) (mem. op.); *see* TEX. R. EVID. 901(b)(1).

Pertinent to this issue, the trial court, in its findings of fact and conclusions of law, found that Smith "served as an agent" of the Nises and "had personal knowledge of all issues related to the contract, payments made, and the condition of the property, both before and after the lease was made." Jamar does not challenge this finding, and the record shows that Smith assisted the Nises in leasing the property, monitoring the property during the lease term, participating in end-of-lease discussions with Jamar, initiating eviction proceedings against Jamar, and repairing

11

damage to the property after Jamar left. Smith also participated in drafting the lease. And knowing that the Nises had no experience being landlords, he encouraged them "to document everything." Mrs. Nise shared her spreadsheets with Smith, and Smith reviewed the checks sent by Jamar to pay his rent. Smith confirmed that the spreadsheet reflected what he knew about when Jamar's rent payments were received.

We conclude that this evidence supports the trial court's findings that Smith had personal knowledge of the facts giving rise to this suit and thus could authenticate exhibits 4 and 5. *See, e.g.*, *Sprayberry v. Siesta MHC Income Partners, L.P.*, No. 03-08-00649-CV, 2010 WL 1404598, at *6 (Tex. App.—Austin Apr. 8, 2010, no pet.) (mem. op.) (summary-judgment affiant demonstrated personal knowledge of facts where he attested that as agent for movant, he entered into contract at issue and was aware of contract's existence and terms, and had knowledge of facts through status as president of movant's general partner).

Jamar also complains about errors in exhibit 4, noting Smith's testimony that the Nises had miscalculated the late fees and other items in that exhibit. Smith testified that he corrected the amounts that were inconsistent with the lease terms and the applicable law. The trial court admitted a copy of exhibit 4 with Smith's corrections as exhibit 4A. Jamar does not complain about the admission of exhibit 4A, nor does he assert that the trial court relied on any of the miscalculations in

exhibit 4 in determining the damages owed by Jamar. For this reason, Jamar has not shown that any error in admitting exhibit 4 probably resulted in an improper judgment. *See* TEX. R. APP. P. 44.1(a).

We overrule Jamar's third and fourth issues.

## Damages Award

In his fifth, sixth, and seventh issues, Jamar attacks the trial court's damages awards for unauthorized pet fees, late rent fees, and unpaid rent, challenging the sufficiency of the evidence supporting these elements of damages.

## A. Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Davis v. MSR Holdings, L.L.C.*, No. 01-22-00451-CV, 2024 WL 3237623, at *7 (Tex. App.—Houston [1st Dist.] June 28, 2024, pet. denied). When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual sufficiency of the evidence supporting them. *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). We review the trial court's findings of fact under the same sufficiency standard used to determine whether sufficient evidence exists to support a jury finding. *See Catalina*, 881 S.W.2d at 297; *Davis*, 2024 WL 3237623, at *7.

When considering whether legally sufficient evidence supports a challenged finding, we must consider the evidence that favors the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We view the evidence in the light most favorable to the trial court's finding and indulge every reasonable inference to support it. *Id.* at 822. Because it acts as the fact finder in a bench trial, the trial court is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). If the evidence at trial "would enable reasonable and fair-minded people to differ in their conclusions," we will not substitute our judgment for that of the fact finder. *City of Keller*, 168 S.W.3d at 822.

In a factual sufficiency review, we consider and weigh all the evidence. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). When a party challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Id.*

**B.    Evidence of damages**

**1.    Unauthorized pet fees**

Jamar asserts that the evidence does not support the trial court's award of $8,000.00 for unauthorized pet fees. Paragraph 8A of the lease states that "[u]nless the parties agree otherwise in writing, Tenant may not permit, even temporarily, any pet on the Property (including but not limited to any mammal, reptile, bird, fish, rodent, or insect)." Paragraph 8B provides that the tenant would be charged an initial amount of $100 in additional rent for each violation of paragraph 8A, and "an additional $15 a day per pet thereafter for each day the Tenant violates the pet restrictions."

There is no writing in evidence that modifies paragraph 8 of the lease, but all parties acknowledged that the Nises agreed to allow Jamar to have three pets on the property. Smith testified that on at least three visits to the property during the lease term, he saw more than three dogs there. Jamar had three dogs and testified that his father, who is identified as a tenant on the lease, also had a dog.

Jamar argues that the evidence does not support the $8,000.00 award because that amount includes $15.00 for every day of the three-year lease term and there was no evidence about how many days excess pets were on the property. Jamar, though, does not account for the fact that his father, who owned the fourth dog, was identified as a tenant on the lease. Jamar testified that his father would stay with him "a month

15

here, a month there," but we defer to the trial court's judgment about the credibility and weight to give this testimony. *See Golden Eagle Archery*, 116 S.W.3d at 761. We conclude that the evidence is sufficient to support the trial court's implicit finding that Jamar violated the pet restrictions for the entire tenancy and thus supports the award for unauthorized pet fees.

We overrule Jamar's fifth issue.

### 2. Late fees

Jamar argues that the trial court erred in awarding the Nises $4,825.00 for unpaid late fees because the evidence proved as a matter of law that they had waived the late-fee provision. As proof that the Nises agreed to waive late fees, Jamar relies on Defendant's exhibit 2, a screenshot of the following text message exchange:

> [Jamar] Thanks for y'all's patience, I will deposit extra for penalties in the next few months. God bless y'all and Merry Christmas!!!
>
> [The Nises] We agreed no late charges last week. Merry and happy[.]

Waiver is the "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *LaLonde v. Gosnell*, 593 S.W.3d 212, 218–19 (Tex. 2019) (quoting *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 391 (Tex. 2014)). "The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right, or intentional conduct inconsistent with the right." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262

16

S.W.3d 773, 778 (Tex. 2008). Waiver must be intentional. *In re Bank One, N.A.*, 216 S.W.3d 825, 827 (Tex. 2007) (orig. proceeding). Waiver may be express or implied. *See Perry Homes v. Cull*, 258 S.W.3d 580, 593 (Tex. 2008). It "may be implied only if the surrounding facts clearly demonstrate it; there can be no waiver if the actor says and does nothing inconsistent with its rights." *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471(Tex. 2004). Waiver is generally a fact question, but if the facts and circumstances are undisputed, it becomes a question of law. *Chalker Energy Partners III, LLC v. Le Norman Operating LLC*, 595 S.W.3d 668, 676–77 (Tex. 2020).

The lease has two provisions that directly pertain to whether the text sent by the Nises amounts to a waiver, as follows:

> 33A. <u>Entire Agreement</u>: There are no oral agreements between Landlord and Tenant. This lease contains the entire agreement between Landlord and Tenant and may not be changed except by written agreement.
>
> 33D. <u>Waiver</u>: Landlord's past delay, waiver, or non-enforcement of a rental due date or any other right will not be deemed to be a waiver of any other breach by Tenant or any other right in this lease.

The Nise's text, "[w]e agreed no late charges last week" could reasonably be interpreted to mean a one-time waiver of the late-fee charge. In his testimony, Jamar testified that he understood the text to mean the Nises were never going to charge him any late fees under the lease, but only because he had a phone call with them after they sent the text. He believed that he and the Nises had an oral agreement to

17

waive late fees. But paragraph 33A of the lease requires a written agreement to modify its terms; a oral agreement cannot alter them. And paragraph 33D of the lease forecloses any possibility of waiver by conduct. Thus, we hold that the evidence supports the $4,825.00 award for unpaid late fees.

We overrule Jamar's sixth issue.

### 3. Unpaid rent

Finally, Jamar argues that the evidence does not support the trial court's award of $22,800 for unpaid rent. The trial court made the following findings of fact in support of its award:

- Jamar held over after the lease terminated.
- Jamar failed . . . to make any payments at all after the automatic increase in payments triggered by his holding over.
- Jamar admitted that he did not pay the May and June 2021 rent payments.
- The holdover amount for rent payments for May and June, 202[1] were $11,400.00 for each of those months.[3]
- Jamar's unpaid rent payments totaled $22,800.00.

---

[3]     Paragraph 22 of the lease provides that "[r]ent for any holdover period will be three (3) times the monthly rent calculated on a daily basis, and will be immediately due and payable daily without notice or demand."

Jamar does not challenge these findings, which fully substantiate the amount of the unpaid rent award. Thus, Jamar has waived his seventh issue.[4] *See Stanley*, 2025 WL 2471796, at *12; *Lombardo*, 437 S.W.3d at 667 n.3.

## Conclusion

We affirm the trial court's judgment.


Clint Morgan
Justice


Panel consists of Chief Justice Adams and Justices Morgan and Dokupil.

---

[4] Jamar also reiterates his evidentiary challenge to Smith's testimony on this issue, arguing that Smith lacked the personal knowledge required to authenticate the calculations in plaintiffs' exhibit 4. We have already determined that the trial court did not err in concluding that Smith had personal knowledge, so we do not revisit the issue here.